**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLISON MCCALLISTER, individually, and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION – COMPLAINT** |
| MRO CORPORATION, MEDICOPY SERVICES, INC. and DEACONESS HEALTH SYSTEM, INC., | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Allison McCallister ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against the Defendants MRO Corporation ("MRO"), MediCopy Services, Inc. ("MediCopy"), and Deaconess Health System, Inc. ("Deaconess") (collectively, "Defendants"). Plaintiff brings this action by and through her attorneys, and alleges, based upon personal knowledge as to her own actions, and based upon information and belief and reasonable investigation by her counsel as to all other matters, as follows.

## I.      <u>INTRODUCTION</u>

1.      Defendant Deaconess operates over twenty hospitals in Illinois, Indiana, and Kentucky which provide medical services to over 1.5 million patients. As part of its operations, Deaconess collects, maintains, and stores highly sensitive "personally identifying information" ("PII"), and "protected health information" ("PHI") (collectively, "Private Information") from its patients.

2.      Deaconess partners with Defendants MediCopy and MRO to handle and manage its patients' Private Information, including the handling of "release of information" (ROI) requests.

As an integral part of this business relationship, Deaconess transmitted its patients' Private Information to MediCopy and MRO and this information was stored and maintained by MediCopy and MRO.

3.      Between January 13, 2026 and February 2, 2026, unauthorized actors infiltrated MediCopy and MRO's cloud storage systems and successfully stole Private Information belonging to Deaconess' patients (the "Data Breach"). On and around March 30, 2026, Deaconess began notifying affected patients, informing them that their names, dates of birth, Social Security numbers, dates of service, medical record numbers, health insurance information, and medical records related to the treatment received at Deaconess Health System hospitals were compromised in the Breach.

4.      The Data Breach was caused by numerous failures and deficiencies on the part of Defendants, and Deaconess' current and former, Plaintiff and Class members, were damaged as a result.

5.      Accordingly, Plaintiff brings this action on behalf of all those similarly situated to seek relief for, *inter alia*, the consequences of Defendants' failure to reasonably safeguard their Private Information; their failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendants' failure to inform Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.     PARTIES

### Plaintiff

6.      Plaintiff Allison McCallister is a citizen of Waverly, Kentucky. Plaintiff McCallister is a patient of Deaconess. Plaintiff McCallister received a notice from Deaconess informing her that her Private Information was compromised in the Data Breach.

**Defendants**

7. Defendant MRO Corporation is a Pennsylvania corporation with its principal place of business located at 1000 Madison Avenue, Suite 100, Norristown, Pennsylvania 19403.

8. Defendant MediCopy Services, Inc. is a Tennessee corporation, which maintains its principal place of business: at 1000 Madison Avenue, Suite 100, Norristown, Pennsylvania 19403. Defendant MediCopy is a wholly owned subsidiary of Defendant MRO.

9. Defendant Deaconess Health System is an Indiana Corporation with its principal place of business located at 600 Mary St, Evansville, Indiana 47747.

### III.    JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from at least one of the Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

11. This Court has personal jurisdiction over Defendant MRO and Defendant MediCopy because both Defendants maintain a principal place of business in Pennsylvania. This Court has personal jurisdiction over Defendant MediCopy because it purposefully availed itself of the Court's jurisdiction by conducting extensive business dealings with Defendants MRO and MediCopy and because those business dealings specifically gave rise to this civil class action.

12. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because two of the three Defendants reside in this judicial district.

## IV.   FACTUAL ALLEGATIONS

**A.   Defendants Deaconess, MediCopy, and MRO – Background**

13.   Defendant Deaconess provides healthcare services to some 1.5 million patients through twenty-two hospitals located across Illinois, Indiana, and Kentucky.

14.   Defendant MediCopy provides data exchange services for healthcare providers, specializing in handling medical record releases.

15.   Defendant MRO is a clinical data exchange service company that manages clinical data for hospitals and health systems. Defendant MRO purchased MediCopy in 2022, and MediCopy thereafter became a wholly owned subsidiary of MRO with its information, software, networking, and other technologies, as well as its general business operations, being fully integrated into MRO's systems and operations.[1]

16.   Deaconess maintains an ongoing business relationship with MediCopy and MRO, through which MediCopy would handle release of information (ROI) requests on behalf of Deaconess' patients.

17.   As is standard for a healthcare services provider, Deaconess collects, maintains, and stores large volumes of Private Information belonging to its current and former patients as part of its general business operations.

18.   As an integral component of the business relationship between Deaconess and MediCopy, Deaconess transmitted its patients' Private Information to MediCopy and MRO for storage and handling.

19.   Upon information and belief, MediCopy and MRO failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals

---

[1] *Clinical Data Release Leader MRO Announces Acquisition of MediCopy*, MRO Corp (Feb. 22, 2022), https://mrocorp.com/news/clinical-data-release-leader-mro-announces-acquisition-of-medicopy/.

accessing the Private Information of Deaconess' current and former patients—Plaintiff and Class members.

20.    Deaconess' patients, such as Plaintiff and Class members, provided their Private Information to Deaconess with the reasonable expectation that any entity with access to this information (including Deaconess' business partners who accessed and stored that Private Information, such as MediCopy and MRO) would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

21.    This expectation was objectively reasonable and based on an obligation imposed on all Defendants by statute, regulations, industrial custom, and standards of general due care.

22.    Unfortunately for Plaintiff and Class members, Defendants failed to carry out their duty to safeguard sensitive Private Information and provide adequate data security. As a result, they failed to protect Plaintiff and Class members from having their Private Information accessed and stolen during the Data Breach.

**B.    The Data Breach**

23.    On January 13, 2026, unauthorized actors, presumed to be cybercriminals, successfully infiltrated MediCopy/MRO's controlled cloud-based file-sharing software.

24.    On February 2, 2026, MediCopy/MRO discovered the intrusion and informed Deaconess.

25.    Deaconess, after a review of the information provided by MediCopy/MRO, determined that patient information was compromised in the Breach, including names, dates of birth, dates of service, medical record numbers, Social Security numbers, health insurance

information, and medical records related to the treatment received at Deaconess Health System hospitals.

26.     On and around March 20, 2026, Deaconess began notifying affected patients impacted by the Data Breach.

**C.     <u>Defendants' Many Failures Both Prior to and Following the Breach</u>**

27.     Defendants collect and maintain vast quantities of Private Information belonging to Plaintiff and Class members as part of their normal operations. The Data Breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendants.

28.     First, Defendants MediCopy and MRO inexcusably failed to implement reasonable security protections to safeguard their information systems and databases. In turn, Defendant Deaconess failed to exercise due diligence by insufficiently vetting, auditing, and otherwise testing the security of MediCopy and MRO's systems before it transmitted patient information to MediCopy and MRO.

29.     Second, Defendant MediCopy and MRO failed to timely detect this data breach within their cloud storage systems, becoming aware of the intrusion twenty (20) days after the successful infiltration. During these twenty days, cybercriminals were able to access, peruse, and steal the Private Information of Plaintiff and Class members at will.

30.     Third, Defendants failed to inform the public that Private Information belonging to Deaconess patients were stored and maintained in an insecure manner. Had Plaintiff and Class members been aware that Deaconess and its partners did not have adequate safeguards in place to protect such sensitive Private Information, they would have never provided such information to Deaconess or taken steps to prevent its transmission.

31.     Defendants' delays in detecting the Breach and in disseminating notice to victims greatly exacerbated the resulting harm to Plaintiff and Class members because it provided the cybercriminals who stole their Private Information to freely monetize, misuse and/or disseminate that Private Information before Plaintiff and Class members could take any affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

**D.     The Age-Old Trade for Stolen Data and the Rise of Data Breaches**

32.     While the prevalence and severity of data breaches have increased exponentially over the past five years, the illicit trade of stolen data dates back to the earliest days of the internet. In the 1990s, cybercriminals sold stolen data through Internet Relay Chat (IRC) channels, which were primitive message boards and instant messaging services, before transitioning to dedicated web forums in the early 2000s.[2] These forums became havens for cybercriminals of all stripes where "individuals advertised their services to other users. Forums quickly gained popularity and became successful businesses with vendors selling stolen credit cards, malware, and related goods and services to misuse personal information and enable fraud."[3]

33.     A forum known as ShadowCrew, which operated for just two years before being shut down by a law enforcement task force operation in 2004, served as the most prominent port of call during this era, and its members managed to traffic over 1.7 million stolen credit card details in the brief period of time it was online.[4]

---

[2] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (Nov. 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.
[3] *Id.*
[4] *Id.*

34.     The end of ShadowCrew did not dampen the illicit trade in stolen data. Instead, the trade moved to the dark web where it thrives to this day. Gone are the days of archaic IRC channels and dusty forums; stolen data is now traded on dedicated webpages serving as veritable e-commerce stores (akin to Amazon, eBay, and Alibaba) for stolen data of all kinds, complete with eye-catching webpages, distinct branding, and advertising to attract customers.[5] The vendors operating from these dark web storefronts are "frequently offer discounts and promotions to buyers to attract customers and keep them loyal," and offer clearance sales on old and/or expiring inventory, such as expiring credit card numbers, in a macabre reflection of commercial practices from the right side of the law.[6]

35.     This decades-old black market for stolen data continues to thrive, and stolen PII, PHI, and financial account information are exchanged as simple commodities with prices set by the brutal and invisible hand of economics. Typically, online banking login information can be purchased for $100 each, full credit card details can be purchased for between $10 and $100, and comprehensive data packages which can enable complete theft of an individual's identity can be purchased for $1,000 or more.[7]

36.     For criminals, the ROI on purchased information can be exceptional despite the dubious nature of black-market dealings and the inherent risks therein. For example, a cybercriminal "who buys 100 cards for $500 can recoup costs if only 20 of those cards are active

---

[5] *Id.*
[6] *Id.*
[7] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.

and can be used to make an average purchase of $30."[8] Based on these incentives, data breaches "are likely to continue as long as there is demand for illicit, profitable data."[9]

37.     In this thriving black market, the producers are the cybercriminals who steal information to sell. And fueled by the voracious demand for stolen data in this thriving black market, dedicated gangs and organized crime rings have stepped up to meet the market demand, which has resulted in a precipitous increase in the number of data breaches in recent years.

38.     The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2024 listed 3,158 total compromises, for which 1,350,835,988 individual victim notices were dispatched.[10] This is just 57 breaches short of 2023's record-breaking total of 3,205 data breaches.[11] But the astronomical figure of 1,350,835,988 victim notices represents a 211% increase over 2023's 353,027,892 victim notices, primarily due to five "mega-breaches" (breaches involving at least 100 million victims) which took place in 2024.[12]

39.     Statista, a German entity that collects and markets data relating to, among other things, data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with

---

[8] Thomas Holt, *How massive data breaches flood illicit markets while personal information fuels cybercrime economy*, Milwaukee Independent (Nov. 12, 2025), available at https://www.milwaukeeindependent.com/syndicated/massive-data-breaches-flood-illicit-markets-personal-information-fuels-cybercrime-economy/.
[9] *Id.*
[10] *2024 Data Breach Report*, Identity Theft Resource Center (Jan. 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report/.
[11] *2023 Data Breach Report*, Identity Theft Resource Center (Jan. 2023), available at https://www.idtheftcenter.org/publication/2023-data-breach-report/.
[12] *2024 Data Breach Report*, Identity Theft Resource Center (Jan. 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report/; *2023 Data Breach Report*, Identity Theft Resource Center (January 2023), available at https://www.idtheftcenter.org/publication/2023-data-breach-report/.

157 compromises reported that year, to a peak of 3,205 in 2023.[13] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 1.35 billion in 2024.[14]



*Figure 1 – Number of Data Breaches and Affected Individuals from 2005 to 2024.*[15]

### E.    How the Theft and Sale of Data Harms Individuals

40.    Individuals who have unfortunately had their information stolen and sold on the black-market face severe consequences which belie the blatant ubiquity of such transactions. Using this stolen information, criminals and other unsavory groups can fraudulently take out loans under

---

[13] *Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2024*, Statista (updated May 23, 2025), available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed.
[14] *Id.*
[15] *Id.*

the victims' name, open new lines of credit, and cause other serious financial difficulties for victims.[16]

41.    This is exacerbated by the fact that the problems arising from a compromised social security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[17]

42.    Further, as data breaches become ever more prevalent and as technology advances, computer programs can scan the internet to create a mosaic of information that could be used to link compromised information to an individual in ways in a phenomenon known as the "mosaic effect." By and through this process, names, dates of birth, and contact information such as telephone numbers and email addresses, hackers and identity thieves can access users' other accounts by, for example, bypassing security questions and 2FA security with the comprehensive collection of information at their disposal.

43.    Thus, because of this effect, cybercriminals and other unauthorized parties could use Plaintiff's and Class Members' Private Information to access, inter alia, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members, even when that specific category of information is not compromised in a given breach.

---

[16] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[17] *Id.*

44.    A particularly trouble example of this effect is the development of "Fullz" packages. A "Fullz" packages is a dosser of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically represent an alarmingly accurate and complete profile of a given individual.

45.    Therefore, through the use of these "Fullz" packages, stolen Private Information from this Data Breach can be easily linked to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. Thus, even if certain information such as emails, phone numbers, or credit card or financial account were not compromised in this Data Breach, criminals can easily create a Fullz package to sell for profit.

46.    Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiff and the Class. And any reasonable for any trier of fact will find that Plaintiff and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

**F.    The Unique Severity of Medical Data Breaches**

47.    The HIPAA Journal's 2024 Health Care Data Breach Report noted 725 data breaches involving 500 or more healthcare records.[18] In 2023, there were 747 compromises involving healthcare data and 720 in 2022.[19]

---

[18] Steve Adler, 2024 Healthcare Data Breach Report, The HIPAA Journal (Jan. 30, 2025), available at https://www.hipaajournal.com/december-2023-healthcare-data-breach-report/.
[19] *Id.*

48.     The most sought after and expensive information on the dark web are stolen medical records which command prices from $250 to $1,000 each.[20] Medical records are considered the most valuable because unlike credit cards, which can easily be canceled, and social security numbers, which can be changed, medical records contain "a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information."[21] With this bounty of ill-gotten information, cybercriminals can steal victims' public and insurance benefits and bill medical charges to victims' accounts.[22] Cybercriminals can also change the victims' medical records, which can lead to misdiagnosis or mistreatment when the victims seek medical treatment.[23] Victims of medical identity theft could even face prosecution for drug offenses when cybercriminals use their stolen information to purchase prescriptions for sale in the drug trade.[24]

49.     The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. Victims of medical identity theft spend an average of $13,500 to resolve problems arising from medical identity theft and there are currently no laws limiting a consumer's liability for fraudulent medical debt (in contrast, a consumer's

---

[20] Paul Nadrag, Capsule Technologies, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (Jan. 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[21] *Id.*

[22] *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (Mar. 15, 2021), available at https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare.*See also* Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (Aug. 25, 2016), available at https://www.consumerreports.org/health/medical-identity-theft-a1699327549/; *Data Breaches: In the Healthcare Sector*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Dec. 1, 2024).

[23] *Id.*

[24] *Id.*

liability for fraudulent credit card charges is capped at $50).[25] It is also "considerably harder" to reverse the damage from the aforementioned consequences of medical identity theft.[26]



*Figure 2 – Number of Individuals Affected by Healthcare Data Breaches from 2009 to 2024.*[27]

50.     In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities like Defendants charged with maintaining and securing patient PII should know the importance of protecting that information from unauthorized disclosure. Indeed, Defendants knew, or certainly should have known, of the high-profile data breaches in the health care industry: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[28]

51.     In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized

---

[25] Medical Identity Theft, AARP (Mar. 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.

[26] *Id.*

[27] Steve Adler, 2024 Healthcare Data Breach Report, The HIPAA Journal (Jan. 30, 2025), available at https://www.hipaajournal.com/december-2023-healthcare-data-breach-report/.

[28] *See, e.g.*, Steve Adler, *Healthcare Data Breach Statistics*, HIPAA Journal (Nov. 25, 2024), available at: https://www.hipaajournal.com/healthcare-data-breach-statistics.

these enforcement actions to place companies like Defendants on notice of their obligation to safeguard customer and patient information.[29]

52.     Given the nature of the Data Breach, as well as the length of the time Defendants' networks were breached and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class members' Private Information can easily obtain Plaintiff's and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

53.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[30] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

54.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class members from misappropriation. As a result, the injuries to Plaintiff and Class members were directly and proximately caused by MediCopy and MRO's failure to implement or maintain adequate data security measures and Deaconess' failure to properly audit and test MediCopy and MRO's security measures prior to sharing its patients' Private Information.

---

[29] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (F.T.C. Jan. 26, 2021).
[30] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar. 25, 2020), available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18, 2021), available at https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

**G.** **Defendants Have a Duty and Obligation to Protect Private Information**

55.     Defendants have an obligation to protect the Private Information belonging to Plaintiff and Class members. First, this obligation was mandated by government regulations and state laws, including HIPAA and FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII and PHI. Third, Defendant Deaconess imposed such an obligation on itself with its promises regarding the safe handling of data. Plaintiff and Class members provided, and Defendants obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

**1.** **HIPAA Requirements and Violation**

56.     HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing protected information, and implement procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

57.     HIPAA, as applied through federal regulations, also requires private information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

58.     The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires entities to provide notice of a data breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

16

59.    Defendants MediCopy and MRO failed to implement and/or maintain procedures, systems, and safeguards to protect the Private Information belonging to Plaintiff and Class members from unauthorized access and disclosure and Defendant Deaconess failed to exercise due diligence by properly testing and auditing MediCopy and MRO's systems.

60.    Upon information and belief, Defendants' security failures include, but are not limited to:

  a. Failing to maintain an adequate data security system to prevent data loss;

  b. Failing to mitigate the risks of a data breach and loss of data;

  c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendants create, receive, maintain, and transmit in violation of 45 CFR 164.306(a)(1);

  d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

  e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

  f. Failing to identify and respond to suspected or known security incidents;

  g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

  h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

  i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

  j. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

k.     Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

61.     Upon information and belief, Defendants also failed to store the information they collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

62.     Upon information and belief, Defendants also violated the HIPAA Breach Notification Rule since they did not inform all affected individuals within 60 days of discovering the Data Breach.

### 2.     FTC Act Requirements and Violations

63.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

64.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[31] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and

---

[31] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (Oct. 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed Aug. 15, 2023).

implement policies to correct security problems.[32] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33] Defendants clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

65.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

66.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67.    Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

68.    As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to

---

[32] *Id.*
[33] *Id.*

19

protect against unauthorized access to Plaintiff's and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

69. Defendants were fully aware of its obligation to protect the Private Information of its current and former patients, including Plaintiff and Class members. Defendants are all sophisticated and technologically savvy business that rely extensively on technology systems and networks to maintain its practice, including storing patients' PII and PHI to operate their business.

70. Defendants had, and continue to have, a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendants and Plaintiff and Class members. Defendants alone have the ability to implement proper security measures on its cyber security network and to test the adequacy of this security.

**3.**      **Industry Standards and Noncompliance**

71. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

72. Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

73. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability

20

Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[34]

74.   The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

    a.   Control who logs on to your network and uses your computers and other devices.

    b.   Use security software to protect data.

    c.   Encrypt sensitive data, at rest and in transit.

    d.   Conduct regular backups of data.

    e.   Update security software regularly, automating those updates if possible.

    f.   Have formal policies for safely disposing of electronic files and old devices.

    g.   Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

75.   Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including: (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps;

---

[34] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list (last visited Feb. 11, 2026).

(ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[35]

76.     Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

77.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### 4.     Defendant Deaconess' Stated Policies and Promises

78.     Defendant Deaconess' own published privacy policy states that: "We are required by law to maintain the confidentiality of your Protected Health Information (PHI), to give you this Notice describing our practices and legal duties, to follow the terms of the current Notice, and to notify you if your unsecured protected health information has been breached."[36]

---

[35] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations (last visited Feb. 11, 2026).
[36] *Deaconess Joint Notice of Privacy Practices* (updated Feb. 16, 2026), available at https://www.deaconess.com/getcontentasset/d3f74b91-2674-43c4-a747-7940c1337524/5675f749-da0d-4143-b58b-9f9b6d59d84c/notice-of-privacy-practices-dhs.pdf.

79.     The notice also states the following:

> **Business Associates**: We may disclose your PHI to contracted parties called Business Associates who assist us by performing services on our behalf. These parties are obligated by law and contract to protect your PHI.[37]

80.     Defendant Deaconess failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate the systems managed by its business associates and steal the Private Information belonging to its patients.

## H.     Plaintiff and the Class Suffered Harm Resulting from the Data Breach

81.     Like any data hack, the Data Breach presents major problems for all affected.[38]

82.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[39]

83.     The ramifications of Defendants' failure to properly secure Plaintiff's and Class members' Private Information are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

84.     According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

---

[37] *Id.*

[38] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.

[39] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

85.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

86.     Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the Class at an imminent, immediate, and continuing increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[40] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[41]

87.     There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

88.     Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[42] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[43]

---

[40] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (Jan. 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[41] *Id.*
[42] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymB hAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_B wE&gclsrc=aw.ds.
[43] *Id.*

24

89.　　The theft of medical information, beyond the theft of more traditional forms off PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far outstrips the increase in incidence of traditional identity theft.[44] Medical Identity Theft is especially nasty for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (e.g., a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution under anti-drug laws.[45]

90.　　Here, due to the Breach, Plaintiff and Class members have been exposed to injuries that include, but are not limited to:

a.　　Theft of Private Information;

b.　　Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.　　Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.　　Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendants' delay in disseminating notice in accordance with state law;

---

[44] Medical Identity Theft, AARP (Mar. 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.
[45] *Id.*

25

e.  The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.  The loss of Plaintiff's and Class members' privacy.

91.  Plaintiff and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals.

92.  As a direct and proximate result of Defendants' acts and omissions in failing to protect and secure Private Information, Plaintiff and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

93.  Plaintiff retains an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## EXPERIENCES SPECIFIC TO PLAINTIFF

94.  Plaintiff McCallister has been a patient of Deaconess for over twenty years. Plaintiff McCallister received Deaconess' email notice, which informed her that her Private Information was compromised in the Breach.

95.  After the Data Breach, Plaintiff McCallister experienced a significant increase in the daily number of spam and phishing calls and emails.

96.  As a result of the Data Breach, Plaintiff McCallister has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff McCallister has also spent several hours dealing with

26

the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

97.    As a result of the Data Breach, Plaintiff McCallister has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff McCallister is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

98.    Plaintiff McCallister suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

99.    As a result of the Data Breach, McCallister anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS REPRESENTATION ALLEGATIONS

100.    Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendants, their executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

101.    <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process. On information and belief, the number of affected individuals estimated to be in the hundreds of thousands based on the size of Deaconess' operations. The members of the Class will be identifiable through information and records in Defendants' possession, custody, and control.

102.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    When Defendants learned of the Data Breach;

b.    Whether hackers obtained Class members' Private Information via the Data Breach;

c.    Whether Defendants' response to the Data Breach was adequate;

d.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.    Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

f.    Whether Defendants owed a duty to safeguard their Private Information;

g.    Whether Defendants breached their duty to safeguard Private Information;

h.    Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

i.    Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class members;

28

j.      Whether Defendants' conduct violated the FTCA and/or HIPAA;

k.      Whether Defendants' conduct was negligent;

l.      Whether Defendants' conduct was *per se* negligent;

m.      Whether Defendants were unjustly enriched;

n.      What damages Plaintiff and Class members suffered as a result of Defendants' misconduct;

o.      Whether Plaintiff and Class members are entitled to actual and/or statutory damages; and

p.      Whether Plaintiff and Class members are entitled to additional credit or identity monitoring and monetary relief.

103.    Typicality: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class had their Private Information compromised in the Data Breach. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendants' uniform wrongful conduct. Likewise, the relief to which Plaintiff is entitled to are typical of the Class because Defendants have acted, and refused to act, on grounds generally applicable to the Class.

104.    Adequacy: Plaintiff is an adequate class representative because her interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, she has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor her counsel have any interests that are antagonistic to the interests of other members of the Class.

105.    Superiority: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would

29

be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendants' records and databases.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(By Plaintiff on behalf of the Class against all Defendants)**

106.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

107.    Defendants owe a duty of care to protect the Private Information belonging to Plaintiff and Class members. Defendants also owe several specific duties including, but not limited to, the duty:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

    b.    to protect Private Information in their care by using reasonable and adequate security procedures and systems compliant with industry standards;

    c.    to have procedures in place to detect the loss or unauthorized dissemination of Private Information in their possession;

    d.    to employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class members pursuant to the FTCA;

    e.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches;

f.   to exercise due diligence in testing and auditing the security practices apparatus of business partners prior to sharing patient information; and

g.   to promptly notify Plaintiff and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

108.   Defendants owe this duty because it had a special relationship with Plaintiff's and Class members. Plaintiff and Class members entrusted their Private Information to Defendants on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendants had the ability to protect their systems and the Private Information stored on them from attack.

109.   Defendants also owe this duty because industry standards mandate that Defendants protect confidential Private Information.

110.   Defendants also owe a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiff and Class members. This duty exists to provide Plaintiff and Class members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

111.   Defendants breached the duties owed to Plaintiff and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

112.   Defendants also breached the duties owed to Plaintiff and Class members by failing to timely and accurately disclose to them that their Private Information had been improperly acquired and/or accessed.

113.   As a direct and proximate result of Defendants' conduct, Plaintiff and Class members were damaged. These damages include, and are not limited to:

31

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanent increased risk of identity theft.

114.    Plaintiff and Class members were foreseeable victims of any inadequate security practices on the part of Defendants and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

115.    In failing to provide prompt and adequate individual notice of the Data Breach, Defendants also acted with reckless disregard for the rights of Plaintiff and Class members.

116.    Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

## COUNT II
## NEGLIGENCE *PER SE*
### (By Plaintiff on behalf of the Class against all Defendants)

117.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

118.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendants to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiff and Class members.

32

119. HIPAA imposes a duty on Defendants to implement reasonable safeguards to protect Plaintiff's and Class members' Private Information. 42 U.S.C. § 1302(d), *et seq*.

120. HIPAA also requires Defendants to render unusable, unreadable, or indecipherable all Private Information it collected. Defendants were required to do so through "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

121. In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq*.

122. Defendants violated the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiff's and Class members' Private Information.

123. Defendants violated HIPAA by failing to properly encrypt the Private Information they collected and stored.

124. Defendants violated HIPAA by unduly delaying reasonable notice of the actual breach.

125. Defendants' failure to comply with HIPAA and the FTCA constitute negligence *per se*.

126. Plaintiff and Class members are within the class of persons that the FTCA and HIPAA are intended to protect.

127.    It was reasonably foreseeable that the failure to protect and secure Plaintiff's and Class members' Private Information in compliance with applicable laws and industry standards would result in that Information being accessed and stolen by unauthorized actors.

128.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

129.    Plaintiff and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### (By Plaintiff on behalf of the Class against Defendant Deaconess)

130.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

131.    Plaintiff and Class members provided Defendant Deaconess with their Private Information.

132.    By providing their Private Information, and upon Defendant Deaconess's acceptance of this information, Plaintiff and the Class, on one hand, and Deaconess, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contract entered into between the parties.

34

133.    The implied contracts between Deaconess and Plaintiff and Class members obligated Deaconess to take reasonable steps to secure, protect, safeguard, and keep confidential Plaintiff's and Class members' Private Information. The terms of these implied contracts are described in federal laws, state laws, and industry standards, as alleged above. Deaconess expressly adopted and assented to these terms in its public statements, representations and promises as described above.

134.    The implied contracts for data security also obligated Deaconess to provide Plaintiff and Class members with prompt, timely, and sufficient notice of any and all unauthorized access or theft of their Private Information.

135.    Deaconess breached these implied contracts by failing to take, develop and implement adequate policies and procedures to safeguard, protect, and secure the Private Information belonging to Plaintiff and Class members; allowing unauthorized persons to access Plaintiff's and Class members' Private Information; and failing to provide prompt, timely, and sufficient notice of the Data Breach to Plaintiff and Class members, as alleged above.

136.    As a direct and proximate result of Deaconess' breaches of the implied contracts, Plaintiff and Class members have been damaged as described herein, will continue to suffer injuries as detailed above due to the continued risk of exposure of Private Information, and are entitled to damages in an amount to be proven at trial.

## COUNT IV
## UNJUST ENRICHMENT
**(By Plaintiff on behalf of the Class against Defendant Deaconess)**

137.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

138.    This count is brought in the alternative to Count III.

139.    Plaintiff and the Class have a legal and equitable interest in their Private Information that was collected and maintained by Deaconess.

140.    Plaintiff and the Class conferred their Private Information to Deaconess as part of receiving medical care. Plaintiff and the Class also conferred payment to Deaconess in exchange for medical services.

141.    Plaintiff and Class members conferred payment with the understanding that the payment was, in part, to be used to implement data security sufficient to adequately protect their Private Information. This included exercising due diligence in testing, auditing, or otherwise vetting the security apparatus of any business partners before Deaconess transmitted any patient information to partners' systems. Thus, this payment represented a benefit that was to be used for a specific purpose.

142.    Deaconess benefitted from the payments provided by Plaintiff and Class members as they received a direct financial benefit, and Deaconess understood that it was so benefitted.

143.    However, Deaconess did not spend the portion of monies received on the intended purpose of data security (whether over its own systems or by auditing the systems of its partners prior to transmitting patient information). Instead, upon information and belief, Deaconess knowingly and opportunistically elected to increase its own profits at the expense of Plaintiff and Class members by not expending the money on these specific purposes.

144.    Thus, by failing to expend the monies conferred with the express understanding that it would be used on data security, Deaconess knowingly and deliberately enriched itself at the expense of Plaintiff and Class members.

145.    Under the common law doctrine of unjust enrichment, it is inequitable for Deaconess to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and Class members in an unfair and unconscionable manner.

146.    Deaconess is therefore liable to Plaintiff and the Class for restitution in the amount of the benefit conferred on Deaconess as a result of its wrongful conduct, including the portion of the monies it should have spent on data security. Plaintiff and Class members are entitled to full refunds, restitution, and/or damages from Deaconess and/or an order proportionally disgorging all profits, benefits, and other compensation obtained through its wrongful conduct.

## COUNT V
## BREACH OF FIDUCIARY DUTY
**(By Plaintiff on behalf of the Class against Defendant Deaconess)**

147.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

148.    The doctor-patient relationship is a long-established fiduciary relationship, with the physician owing a legal and ethical duty to prioritize his or her patient's wellbeing and interests above their own. Therefore, Deaconess, as a healthcare service provider, owed fiduciary duties to its patients, including Plaintiff and the Class.

149.    Furthermore, by the act of collecting and maintaining Private Information belonging to Plaintiff and the Class, Deaconess created a fiduciary relationship between itself and Plaintiff and Class members. As such, Deaconess owed a duty to *primarily* act for the benefit of its current and former patients upon matters pertaining to this Private Information, including data security.

150.    These fiduciary duties and responsibilities are also described under the procedures set forth in the HIPAA Privacy Rule, including the procedures and definitions found in 45 C.F.R.

37

§160.103 and 45 C.F.R. §164.530, which requires Deaconess to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

151.    Plaintiff and Class members provided their Private Information to Deaconess in confidence with the reasonable belief that Deaconess would protect their information. This included the expectation that Deaconess would exercise proper due diligence before transmitting this Private Information to business partners. Plaintiff and Class members would not have provided their information to Deaconess had they known it would fail to adequately protect their information.

152.    Deaconess breached these fiduciary duties by failing to implement adequate safeguards and causing Plaintiff's and Class members' Private Information to be disclosed to unauthorized third parties. Deaconess further breached these fiduciary duties by contracting or otherwise doing business with companies that similarly failed to implement adequate safeguards, and sharing Plaintiff and Class members' Private Information with these entities.

153.    As a direct and proximate result of Deaconess' breaches of its fiduciary duties and the resulting disclosure of Plaintiff and Class member's Private Information, Plaintiff and Class members have suffered damages, including, but not limited to exposure to heightened future risk of identity theft, loss of privacy, confidentiality, and emotional distress, and humiliation.

## COUNT VI
## INVASION OF PRIVACY
### (By Plaintiff on behalf of the Class against all Defendants)

154.    Plaintiff incorporates and reallege all allegations in Paragraphs 1 through 105 as if fully set forth herein.

155.    Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that Defendants possessed and/or continue to possess.

156. By failing to keep Plaintiff's and Class members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendants invaded Plaintiff's and Class members' privacy by:

    a.     Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

    b.     Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

157. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiff's position would consider Defendants' actions highly offensive.

158. Defendants invaded Plaintiff's and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

159. As a proximate result of such misuse and disclosures, Plaintiff's and Class members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and Class members' protected privacy interests.

160. In failing to protect Plaintiff's and Class members' Private Information, and in misusing and/or disclosing their Private Information, Defendants have acted with malice and oppression and in conscious disregard of Plaintiff's and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of patients. Plaintiff, therefore, seeks an award of damages, including punitive damages, on behalf of themselves and the Class.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in their favor and against the Defendants, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D.    That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E.    That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F.    That the Court award pre- and post-judgment interest at the maximum legal rate;

G.    That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.    That the Court grant all other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and the putative Class, demands a trial by jury on all issues so triable.

40

Date: March 27, 2026

Respectfully submitted,

*/s/ Andrew W. Ferich*

Andrew W. Ferich (PA I.D. No. 313696)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585
aferich@ahdootwolfson.com

Nickolas J. Hagman*
Alex Lee*
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
nhagman@caffertyclobes.com
alee@caffertyclobes.com

* *Pro Hac Vice* forthcoming

*Attorneys for Plaintiff and the Proposed Class*